IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br>PIONEER HEALTH SYSTEMS LLC, *et al.*,<br><br>Debtors. | :<br>:<br>:<br>: | Chapter 11 (Subchapter V)<br>Bankr. No. 24-10279 (JKS)<br>(Jointly Administered) |
| PROVIDENT HEALTHCARE PARTNERS, LLC,<br>Appellant,<br>v.<br><br>PIONEER HEALTH SYSTEMS LLC, *et al.*,<br><br>Appellees. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civ. No. 25-1550-CFC |

Matthew G. Summers, Margaret A. Vesper, BALLARD SPAHR, LLP, Wilmington, Delaware; Richard G. Baldwin, NYSTROM BECKMAN & PARIS, LLP, Boston, Massachusetts,

*Counsel for Appellant*

Alessandra Glorioso, DORSEY & WHITNEY (DELAWARE) LLP, Wilmington, Delaware; Matthew Olson, DORSEY & WHITNEY LLP, Palo Alto, California;

*Counsel for Appellees*

**OPINION**

September 30, 2026
Wilmington, Delaware

CHIEF JUDGE

## I. INTRODUCTION

This appeal arises in the chapter 11 case of Pioneer Health Systems LLC (together with certain affiliates, the "Debtors") with respect to the Bankruptcy Court's Order dated December 8, 2025 (Bankr. D.I. 824) (the "Order")[1] denying a fee application filed by appellant Provident Healthcare Partners, LLC ("Provident"), for the reasons set forth in the Bankruptcy Court's November 21, 2025 bench ruling (Bankr. D.I. 828) (the "Bench Ruling"). Provident's fee application sought payment for the work it performed as the Debtors' investment banker in a post-confirmation sale contemplated by the Debtors' plan. Pursuant to Provident's retention agreement, which both the parties and the Bankruptcy Court agree is unambiguous, the Debtors engaged Provident to act as its "advisor in connection with the sale of all or any part of the Debtors by means of …" a broad range of transactions, including, specifically, a "reorganization." Following a marketing and auction process, conducted with assistance from Providence, the Bankruptcy Court approved an amended plan of reorganization, pursuant to which the Debtors' noteholders agreed to the subordination of their claims for the benefit of 100% recovery to creditors holding

[1] The docket of the Chapter 11 case, captioned *In re Pioneer Health Systems LLC,* No. 24-10279 (JKS) (Bankr. D. Del.) is cited herein as "Bankr. D.I. __." The appendix (D.I. 11) filed in support of Provident's amended opening brief (D.I. 16) is cited herein as "AA__."

general unsecured claims, an option the Debtors chose over a qualified third-party bid for the sale of its business, and Provident filed its first and final fee application seeking payment of its transaction fee. The Bankruptcy Court denied the application, holding that a transaction that triggered Provident's right to payment of its transaction fee required that some type of "sale" had occurred, which, consistent with its ordinary meaning, is "the transfer of property or title for a price." (*See* Bench Ruling at 7-8 (citing Black's Law Dictionary).)

On December 22, 2025, Provident filed a timely notice of appeal of the Order. D.I. 1. The appeal is fully briefed. D.I. 14, 16, 17. The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. For the reasons set forth herein, the Order will be affirmed.

## II. BACKGROUND

### A. The Debtors and the Retention Agreement

On February 21, 2024, the Debtors, which operate and manage a network of orthopedic clinics, filed voluntary petitions for relief, electing to proceed under Subchapter V of Chapter 11. (AA0099.) On July 5, 2024, the Debtors filed the Second Amended Subchapter V Plan of Reorganization (the "Plan"). (*Id.*) On December 20, 2024, the Bankruptcy Court entered an order confirming the Plan. (AA0234–304.)

The Plan included a post-confirmation marketing process by which the Debtors would test the adequacy of the Plan by considering two proposals the Debtors had already received to purchase the Debtors' business and any other proposals received by the Debtors "with a goal of maximizing the value for all of the Debtors' stakeholders." (AA0115.) The Debtors engaged Provident, as their investment banker, to "solicit bids for the purchase of substantially all of their assets or equity interests." (AA0178.)

On September 18, 2024, the Debtors and Provident entered into a Transaction Engagement Agreement (AA0215-220) (the "Agreement"), which was approved by order of the Bankruptcy Court on October 9, 2024 (AA0229-233) (the "Retention Order"). Pursuant to Section 1 of the Agreement, Provident was engaged

> to act as [the Debtors'] sole and exclusive financial advisor ***in connection with the sale*** of all or any part of the [Debtors'] Company or its divisions or affiliated companies ***by means of*** a merger, consolidation, ESOP related recapitalization, management buyout, ***reorganization***, spin-off, exchange offer, tender offer, sale of stock or assets, or other similar transaction or series of transactions (any of the foregoing, a "Transaction").

(AA0216 at § 1 (emphasis added).) The Agreement provided that Provident would be compensated for its work by receiving a Transaction Fee "immediately upon the completion of a Transaction . . . regardless of whether or not the Prospective Partner was introduced to the Company by Provident Healthcare or otherwise." (*Id.*) The minimum Transaction Fee under the Agreement is $500,000. (AA0216–217 at § 3.)

### B. The Marketing Process and Reorganization

It is not disputed that Provident expended hundreds of hours marketing the Debtors' business, distributing a curated list of potential bidders, contacting 91 potential bidders, executing NDAs with 35 potential bidders, and obtaining non-binding indications of interest from four potential bidders. (AA0309 at ¶ 12.) Provident also created, hosted, and maintained a virtual data room for bidders and, in coordination with Debtors and their counsel, communicated with potential bidders about the company and the bidding process. (AA0729 at ¶ 8.) The facts related to the services rendered by Provident, and the transaction ultimately at issue in this appeal, are largely undisputed and were summarized in the Bench Ruling as follows:

> Debtors received a qualified baseline bid from third-party, Kiron. Debtors conducted an auction, which a Provident representative attended. At the start of the auction, debtors announced they received a bid from their noteholders to conditionally subordinate their unsecured claims totaling $9.45 million, to the interest of other unsecured creditors, without conducting a sale. Debtors rejected the Kiron bid as not being in the best interests of the debtors and their estates and terminated the auction.
>
> Thereafter, on February 5, 2025, Kiron objected to the sale process and commenced expedited discovery, including seeking production of documents and a deposition of Provident. Prior to the hearing on Kiron's objection, debtor determined to hold a second auction. Debtors retained an independent manager who served as the decision-maker, conducted the second auction, and selected the noteholder group's proposal as the baseline bid.

> During the second auction, Kiron and debtors' management both submitted overbids. Ultimately, debtors' independent manager determined that the subordination of noteholder claims constituted a 100 percent case for creditors and was a better outcome for debtors' stakeholders than Kiron's bid and the sale process was terminated. Debtors' independent manager did not use Provident's services in evaluating the proposals made at the second auction.
>
> Thereafter, the noteholders and the debtors entered into a Subordination Agreement. The Subordination Agreement was filed with a supplement to the debtors' Second Amended Chapter V Plan. The Subordination Agreement states to materially improve distributions to general unsecured creditors, pursuant to the Pioneer Plan, "During the subordination period, each of the noteholders, subject to the terms of this Agreement, subordinates to general unsecured creditors any payments or distributions that the noteholder is otherwise entitled to receive under the Pioneer Plan."
>
> The Subordination Agreement further provides that, as a precondition to effectiveness, "No sale of all, or substantially all, of the assets of the debtors has occurred pursuant to the Pioneer Plan. The marketing process and auction has concluded, with the debtors determining that a sale is not in the best interests of the debtors, their estates, and creditors and that the debtors' businesses will continue without a sale transaction."

(Bench Ruling at 4-6 (internal citations omitted).)

### C. The Fee Application and Objection

On May 5, 2025, the Debtors filed a Notice of Effective Date, stating that the Plan, as amended and supplemented that day, became effective on May 5, 2025. (AA0722–724.) The Notice of Effective Date set a deadline of August 4, 2025, for

the submission of professionals' final fee applications. (*Id.*) On August 4, 2025, Provident timely filed its first and final fee application (AA0725–755) (the "Fee Application"), seeking $500,000 (the "Transaction Fee") in accordance with the terms of the Agreement.

On August 25, 2025, the Debtors filed an objection to Provident's Fee Application, asserting that Provident was not entitled to a Transaction Fee because, among other things, the marketing process had not culminated in a sale, as that word is commonly defined. (AA0756-793.)

**D. The Bench Ruling and Order**

On November 21, 2025, following briefing and oral argument, the Bankruptcy Court convened a hearing to rule on Provident's Fee Application. As the Bench Ruling explains, "[t]he parties' dispute boils down to what constitutes a transaction, as defined in the … Agreement, for purposes of earning a fee." (Bench Ruling at 6.) The Bankruptcy Court also noted that "the parties defined transaction and that definition is free from ambiguity." (*Id.* at 7.) The Bankruptcy Court explained that "the definition of transaction provides, at its core, that a transaction is a type of sale," before quoting Black's Law Dictionary definition of sale as "the transfer of property or title for a price." (*Id.* at 7-8.) "Although the parties further drafted the definition to provide various examples of the different forms a sale could take, ultimately, whatever its form, it required the transfer of property or title for a price." (*Id.* at 8.)

The Bankruptcy Court concluded that "the facts establish that there was not a transfer of property or title. [And] none of the examples of a transaction as defined in the Agreement occurred." (*Id.* at 8:7–9.) While the Bankruptcy Court "acknowledge[d] the work performed by Provident," it noted that "it is not the Court's role to re-write the contract between the sophisticated market participants, allocating the risk of an agreement after the fact to suit the Court's sense of equity or fairness." (*Id.* at 11 (citing *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *23 (Del. Ch. July 9, 2021).) Based on the foregoing, the Bankruptcy Court sustained the Debtors' objection to the Fee Application. (*See id.* at 11.) On December 8, 2025, the Bankruptcy Court entered the Order denying the Fee Application. (AA0813–814.)

## III. JURISDICTION AND APPLICABLE STANDARDS

The Court has jurisdiction over appeals "from final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a). The Order, which denied Provident's final fee application, is a final, appealable order. *See In re Boddy,* 950 F.2d 334, 336 (6th Cir. 1991) (fee awards are final for purposes of appeal "where the order conclusively determine[s] the entire section 330 compensation to be paid").

This Court "reviews the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its discretionary decisions for abuse of discretion." *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 844 (3d Cir. 2020) (internal quotation marks omitted). Provident challenges the Bankruptcy Court's

conclusion that Provident was not entitled to a fee based on its interpretation of the Agreement. The Bankruptcy Court's legal conclusion and interpretation of the Agreement is subject to *de novo* review. *In re Kaiser Aluminum Corp.*, 380 B.R. 344, 347 (D. Del. 2008).

Delaware courts seek to effectuate "the intent of the parties from the language of the contract." *Cox Commc'n, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022). This approach places great weight on the plain terms of a disputed contractual provision, and Delaware courts "interpret clear and unambiguous terms according to their ordinary meaning." *Id.* (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)). The parties' intent is ascertained from the language of the contract, and extrinsic evidence is not considered unless there is a finding that the text is ambiguous. *Id.* (citing *Exelon Generation Acquisitions, LLC, v. Deere & Co.* 176 A.3d 1262, 1267 (Del. 2017)). "Critically, a contractual provision is 'not rendered ambiguous simply because the parties in litigation differ' as to the proper interpretation." *Id.* (quoting *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)). Ambiguity is present "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Delaware adheres to an objective theory of contracts, meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Delaware courts read the agreement as a whole and give effect to each term and provision so as not to render a provision or term meaningless or illusory. *See id.* "In so doing, [courts] are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Where general and specific provisions conflict, the specific provisions ordinarily qualify the meaning of the general provisions. *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992).

## IV. ANALYSIS

Provident argues that the Bankruptcy Court erred in finding that the Agreement required a conventional sale of the Debtors' assets and that it is entitled to a transaction fee because the Debtors' revised plan of reorganization constituted a transaction. I agree, however, with the Bankruptcy Court's construction of the Agreement.

### A. The Agreement is Unambiguous

As an initial matter, the Debtors and Provident agree that the Agreement is unambiguous in setting forth the terms under which Provident is entitled to payment

(*see* Bench Ruling at 9:21–24), and the Bankruptcy Court agreed (*see id.* at 10:4–7). As I agree, I do not consider anything beyond that unambiguous plain language in deciding this appeal.[2] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (when "a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

---

[2] The Bench Ruling explained that "[a]lthough the Court agrees with the parties that the Agreement can be accurately construed without looking to extrinsic evidence, doing so would not lead to an unlike result." (Bench Ruling at 10.) The Bench Ruling includes discussion of the declaration filed in support of Provident's retention, noting that it "further substantiates that at the time of contracting, the parties intended for a sale to trigger the transaction fee." (*Id.*) The Debtors assert that the Bankruptcy Court did not err in taking notice of materials connected to Provident's retention, as the Debtors' "engagement [of Provident] did not arise in a vacuum," and Delaware's "objective theory" applicable to the dispute here "requires construing language as a reasonable third party would understand it in the parties' commercial context." D.I. 14 at 17 (further explaining that "The Bankruptcy Court's consideration of the Retention Order and plan context was therefore not an effort to 'vary' the Agreement's terms; it was a proper effort to interpret what the parties' words mean to an objective reader in the actual transaction setting the parties created and the Court approved."). Provident argues that the Bankruptcy Court and the Debtors repeatedly cited extrinsic evidence to support their conclusion that a "Transaction" required a sale, that any consideration of these documents was error, and that this Court should ignore those arguments. *See* D.I. 16 at 21-24. The Court will ignore those arguments, as the Bench Ruling expressly did not rely on evidence outside of the Agreement.

### B. The Agreement Unambiguously States that a Sale Is a Condition of Provident's Right to Payment

As noted above, pursuant to section 1 of the Agreement, Provident was engaged

> to act as [the Debtors'] sole and exclusive financial advisor ***in connection with the sale*** of all or any part of the [Debtors'] Company or its divisions or affiliated companies ***by means of*** a merger, consolidation, ESOP related recapitalization, management buyout, ***reorganization***, spin-off, exchange offer, tender offer, sale of stock or assets, or other similar transaction or series of transactions (any of the foregoing, a "Transaction").

(AA0216 at § 1 (emphasis added).) Provident argues that the purported requirement that a sale occur prior to Provident earning its Transaction fee cannot be found in the Agreement. D.I. 16 at 17. According to Provident, section 1 defines the term "Transaction" by reference to a non-exhaustive list of events. D.I. 16 at 18. In Provident's telling, "[i]t defies common sense and the English language to suggest that the phrase "any of the foregoing, a 'Transaction'" refers to a single type of event (a sale) rather than to the non-exhaustive list of nine types of events that immediately precede that phrase." *Id.* The Debtors counter that Provident's theory "elevates one word ('reorganization') into a free-standing fee trigger, while minimizing the rest of the definitional sentence." D.I. 14 at 20-21. According to the Debtors, "Provident wants the Court to believe that the Agreement defines 'Transaction' in a manner that does not require a sale, with the Agreement reading, instead, as follows:

> The Company . . . hereby engages, subject to the approval of the [Bankruptcy Court] . . . Provident Healthcare to act as its sole and exclusive advisor in connection with ~~the sale of all or any part of the Company or its divisions or affiliated companies by means of~~ a merger, consolidation, ESOP related recapitalization, management buyout, reorganization, spin-off, exchange offer, tender offer, sale of stock or assets, or other similar transaction or series of transactions (any of the foregoing, a "Transaction").

*Id.* Thus the Debtors argue, and I agree, that the Bankruptcy Court correctly gave effect to all the words in the Agreement.

Section 1 of the Agreement defines "Transaction" as "the sale . . . by means of" various types of transactions, including a catchall for "other similar or series of transactions." (AA0216 at § 1.) The listed transactions and catchall that follow "by means of" are examples of a "sale," not the definition of "Transaction." Reading the definition as a whole, the phrase "by means of" makes clear that the listed transactions are mechanisms for accomplishing the primary objective described at the outset—*i.e.*, the sale of the business or a part of it to a new owner— rather than nine independent, unrelated fee triggers.

Delaware courts consistently hold that undefined terms in a contract are interpreted according to their ordinary dictionary meaning. *In re P3 Health Grp. Holdings, LLC*, 282 A.3d 1054, 1058 (Del. Ch. 2022); *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020); *Lorillard Tobacco Co.*, 903 A.2d at 738; *USA Cable v. World Wrestling Fed'n Ent. Inc.*, 766 A.2d 462, 474 (Del. 2000).

Under this framework, "sale" carries its ordinary meaning as "the transfer of property or title for a price." *Stifel, Nicolaus & Co., Inc. v. Shift Techs., Inc.*, 2022 WL 3648145, at *4 (S.D.N.Y. Aug. 23, 2022) (citing Black's Law Dictionary, 11th ed. 2019). Applying Delaware law, a reorganization does not automatically constitute a "sale" unless it results in a transfer of ownership for consideration.[3]

Delaware's Supreme Court has emphasized that courts must read "specific provisions of the contract in light of the entire contract," particularly in complex commercial agreements. *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co., LLC*, 166 A.3d 912, 913–14 (Del. 2017). The Bankruptcy Court did exactly that: it

---

[3] Provident argues that the language of the Agreement is readily distinguishable from the language in *Stifel*. *See* D.I. 17 at 7.

In *Stifel*, "Sale of the Company" was defined to mean sale of the majority of company shares or sale of substantially all company assets, and the part of the definition referencing the sale of company shares was followed by a generic parenthetical that identified common ways that a share sale could be completed. *Stifel*, 2022 WL 3648145, at *2. In finding the term "sale" carried its ordinary meaning and was not expanded by the parenthetical language, the New York District Court concluded that the examples within the parenthetical could not override the overarching sale requirement outside the parenthetical. *Id.* at *4. "Here, by contrast," Provident argues, "the list of exemplary transactions is not in a parenthetical. Instead, the trigger for payment, a 'Transaction' is specifically defined by reference to those exemplary transactions." D.I. 17 at 7. "To the extent *Stifel* has any applicability to this dispute, it simply serves as an example of how the parties would have drafted the Agreement if they had intended for Provident to be paid only upon the completion of a sale." *Id.*

While I agree with Provident that different rules of construction are implicated in *Stifel*, that decision supports the conclusion that, in absence of a contractual definition, the ordinary meaning of "sale" is "the transfer of property or title for a price." *Stifel*, 2022 WL 3648145, at *4.

read the definition as a whole and concluded that, whatever its form, the defined transaction required a sale. That conclusion is consistent with Delaware's objective, whole contract approach.

### C. Provident's Reliance on *Spiegel* is Misplaced

I agree with the Debtors that Provident's reliance on *In re Spiegel, Inc.*, 2005 Bankr. LEXIS 291 (Bankr. S.D.N.Y. Feb. 18, 2005) is an extension of the incorrect argument that a sale is not a requirement for Provident to earn a fee under the Agreement. *See* D.I. 16 at 18-21. In *Spiegel*, the debtor objected to a claim filed by JP Morgan Securities, Inc. for a fee under an engagement letter for JP Morgan to market and facilitate a prepetition transaction regarding the debtor's private credit card business. 2005 Bankr. LEXIS 291, at *2. Unlike the Agreement at issue here, the JP Morgan engagement letter defined "Transaction" to mean one or more of several enumerated types of transactions, providing, "For the purposes hereof, the term 'Transaction' shall mean," followed by enumerated events divided up into parts (a) through (d). *See id.* at *9-10. Thus, the definition of "Transaction" in *Speigel* is structured the way Provident would like the Agreement at issue here to have been structured—namely, without specification that a Transaction requires a sale. The bankruptcy court in *Spiegel* sustained the claim objection based on its finding that the definition of Transaction "required some type of sale." *Id.* at *11. The district court disagreed with the bankruptcy court's interpretation but affirmed based on its own

interpretation of the definition of "Transaction" as requiring "an acquisition," which in turn required "continuity in the subject matter being transferred." *See JP Morgan Sec., Inc. v. Spiegel, Inc.*, 175 F. App'x 409, 410-11 (2d Cir. 2006) (summarizing district court decision). The Second Circuit Court of Appeals rejected the bankruptcy and district courts' interpretations of the engagement letter and vacated and remanded the decision disallowing the claim. *Id.* at 411. The Second Circuit found, "The express terms of the Engagement Letter make clear that no sale is required." *Id.* To the contrary, here, the express terms of the Agreement make clear that a Transaction requires a sale.

### D. Provident's Surplusage Argument Fails Because "Reorganization" Retains Meaning as a Method of Effecting a Sale, Even if Not Every Reorganization Triggers a Fee

Provident argues that interpreting "Transaction" as the Bankruptcy Court did to require a sale-like transfer renders "reorganization" superfluous, violating Delaware's anti-surplusage canon. But under the Bankruptcy Court's reading of section 1, "reorganization" retains meaning—namely, a transaction in which a sale is accomplished through a reorganization structure (for example, where a plan effects a transfer of assets, equity, or control for value). Provident's reading, on the other hand, creates its own surplusage problem by effectively rendering "sale" nugatory: if any reorganization triggers a fee regardless of whether any sale occurs, then the Agreement's repeated sale framing becomes meaningless.

## V. CONCLUSION

For the reasons stated above, the Court will affirm the Bankruptcy Court's interpretation of section 1 of the Agreement and its denial of Provident's fee application.

The Court will issue a separate Order consistent with this Opinion.